## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| [UNDER SEAL], | Case No: |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| [UNDER SEAL], | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| Defendant. | |

## DOCUMENT TO BE KEPT UNDER SEAL

## DO NOT ENTER INTO PACER

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES, *ex rel.* DONNA HECKER-GROSS,<br><br>               Plaintiff,<br><br>    v.<br><br>LABORATORY CORPORATION OF AMERICA, INC<br><br>               Defendant. | Case No:<br><br><br>**COMPLAINT**<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff-Relator Donna Hecker-Gross ("Relator"), through her attorneys, on behalf of the United States of America (the "Government"), for her Complaint against Defendant Laboratory Corporation of America, Inc. ("Defendant" or "LabCorp"), alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.    INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United States of America for Defendant's violations of the federal False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "FCA").

2.    This case concerns LabCorp's knowing failure to return overpayments to the Government.

3.    Pursuant to a multi-year, worldwide contract with the Department of Defense ("DOD"), LabCorp provides reference-testing services at military treatment facilities across the United States and abroad.

4.    LabCorp refers to third-party providers tests it does not perform itself.  Under LabCorp's DOD contract, when the company refers a test to another laboratory, LabCorp pays

the third party and then charges DOD the cost of the test plus a small fixed fee.

5.       In 2017, staff at Walter Reed National Military Medical Center ("Walter Reed") questioned LabCorp about charges for a several-thousand-dollar test that LabCorp referred to a third party. The test identifies genetic abnormalities in children and fetuses. The test analyzes DNA samples from the child or fetus and one or both biological parents. Although the third-party lab runs two or three analyses, depending on whether it samples one or both parents' genes, the third-party provider charges only for the report ultimately generated for the child or fetus. LabCorp, in turn, only pays the provider for one test.

6.       LabCorp should therefore only charge DOD for the single test plus the small fixed fee.

7.       Staff at Walter Reed noticed that LabCorp was charging the military facility for the parental samples in addition to the child's or fetus's report. The staff members challenged LabCorp employees other than Relator on multiple occasions about the propriety of this billing. LabCorp employees insisted the company had appropriately billed for the test, even though those employees did not review the billing procedures of the third party. Not until Walter Reed staff asked Relator about the suspected overbilling did LabCorp investigate the staffs' concerns.

8.       After Relator requested confirmation of the third-party provider's billing practices, LabCorp discovered that it had been improperly double or triple billing Walter Reed for the test by charging for each sample analyzed, rather than only for the child's or fetus's report. LabCorp therefore had been charging the Government two or three times what it paid for the test, pocketing the difference in violation of its contract with DOD.

9.       LabCorp, however, only conducted a limited investigation that failed to uncover the full size and scope of the problem. The company only reviewed billing records for tests performed at Walter Reed between March 2016 and July 2017, even though it had been performing the tests for years and even though the test had been performed at military treatment

facilities nation- and worldwide and for other Government payers.

10.     Not only did LabCorp knowingly choose to conduct an improperly narrow investigation to avoid discovering the full extent of the overbilling that had occurred, it also knowingly failed to repay some of those overpayments it actually identified in a conscious effort to retain known overpayments by the Government that its past overcharges had caused. Instead of paying even all of the specific overcharges its limited review had uncovered, LabCorp only offered Walter Reed a credit for double or triple billed tests dating back to January 2017, with a promise to correct the billing issue going forward. This was so even though, at the time it offered that reimbursement to Walter Reed, LabCorp had already identified over $100,000 in additional inappropriate billings between March 2016 and January 2017 that it knowingly and purposefully kept from Walter Reed and retained. Moreover, having discovered the nature of the error that caused the overcharges to Walter Reed, LabCorp also chose to turn a blind eye to similar overcharges that would have affected other claims of the same nature made at other DOD facilities and/or under similar contracts affecting other Government payers.

11.     Relator protested and insisted that LabCorp had a duty to properly bill DOD military treatment facilities under its contract and to repay all overcharges that had resulted from the past pattern of billing errors that LabCorp had discovered, both with respect to Walter Reed and, by implication based on the global nature of the discovered error, with any other similarly affected DOD (or other Government) accounts. To prevent Relator from exposing its cover up, Relator's supervisor ordered her not to visit Walter Reed as she usually did and forbid her from speaking with any staff at the facility. A few days after she protested, LabCorp fired Relator on pretext.

12.     Through this action, Relator seeks to require LabCorp to adhere to its obligations under its contract and its general obligation not to overcharge the United States military.

13.     This is also an action by Relator to recover damages for her retaliatory discharge

and for other retaliatory actions by Defendants. During her tenure at LabCorp, Relator investigated, reported, and objected to Defendants' fraudulent conduct that violated the FCA. Relator repeatedly complained about these matters to her immediate supervisors. Defendant retaliated against Relator by terminating her employment on August 8, 2017. Through its retaliatory actions, Defendant violated the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h).

## II.    PARTIES

14.    Defendant LabCorp is a Delaware corporation that operates clinical laboratory facilities throughout the United States. The company's headquarters are in Burlington, North Carolina, and it operates numerous facilities in Maryland.

15.    *Qui Tam* Plaintiff/Relator Donna Hecker-Gross is a Maryland resident. She was formerly employed by LabCorp until her retaliatory dismissal on August 8, 2017.

## III.   JURISDICTION AND VENUE

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

17.    This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendant has minimum contacts with the United States. Moreover, Defendant can be found in and/or transacts or has transacted business related to the allegations made in this Complaint in the District of Maryland.

18.    Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b), 28 U.S.C. § 1395(a), and 31 U.S.C. § 3732(a) because Defendant can be found in, and/or transacts or has transacted business in, this District. At all times relevant to this Complaint, Defendant regularly conducted, and continues to conduct, substantial business within this District, and/or maintained employees and offices in this District.

## IV.   APPLICABLE LAW

### A.   The False Claims Act

19.     Congress originally enacted the FCA during the Civil War and substantially amended the Act in 1986, in 2009, and 2010, each time to clarify the remedial purposes of the Act and/or to enhance the ability of the United States to recover losses sustained through fraud against it.  Congress has characterized the Act as the primary tool for combating fraud against the government, needed modernization.  The FCA provides incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction and encourages the private bar to commit legal resources to prosecuting fraud on the government's behalf.

20.     The FCA prohibits, among other things, knowingly making, using, or causing to be made or used any false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.  31 U.S.C. § 3729(a)(1)(G).  Any person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of the damages sustained by the United States.  31 U.S.C. § 3729(a)(1).

21.     For purposes of the FCA, a person "knows" a claim or statement is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1).  The FCA does not require proof that a defendant specifically intended to commit fraud.  *Id.*

22.     Any person with information about an FCA violation may act as a relator, may bring a *qui tam* action on behalf of the United States, and may share in any recovery.  The FCA requires that the *qui tam* complaint be filed under seal for a minimum of 60 days (without service

on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

## V.     BACKGROUND

### A.     The Defense Health Agency

23.     The Defense Health Agency under the DOD supports the Army, Navy, and Air Force medical services.  It also oversees a group of facilities around Washington, DC through the National Capital Region ("NCR") Medical Directorate.  Walter Reed operates under the NCR Medical Directorate.

### B.     Military Health System Treatment Facilities

24.     The Military Health System ("MHS") within the Department of Defense provides health care to active duty and retired military personnel and their dependents.

25.     As of 2018, the MHS operates several large medical centers, over 50 hospitals, and hundreds of clinics around the world.

26.     Walter Reed is a military treatment facility.

### C.     TRICARE / CHAMPUS

27.     The Defense Health Agency administers CHAMPUS, commonly known as TRICARE, a federally funded program that provides medical benefits to active duty members of the military and their dependents, as well as to retirees.  *See* 10 U.S.C. §§ 1071-1110b. Dependents include spouses and minor children.  *Id.* § 1072(2).

28.     TRICARE covers services at both military treatment facilities and non-military facilities.

29.     TRICARE covers a portion of laboratory testing services.  *See* 32 C.F.R. § 199.4.

30.     TRICARE also pays for "[d]iagnostic tests and services, including laboratory" testing services for dependents.  10 U.S.C. § 1077(a)(9).

## VI.    FACTUAL ALLEGATIONS

### A.    LabCorp has a worldwide contract with the Department of Defense to provide laboratory testing services, including tests referred to third-party laboratories.

31.    In or about June 2012, LabCorp entered into a worldwide contract, W81K04-12-D-0017, to provide reference testing services for the Department of Defense.

32.    DOD renewed the contract in 2013, 2014, 2015, 2016, and 2017.

33.    The contract remains in effect.

34.    LabCorp has provided reference-testing services to military treatment facilities worldwide since the contract's inception.

35.    This contract includes reference-testing services at Walter Reed.

36.    Although LabCorp performs most reference testing at its own laboratory, it contracts with third party providers for tests that it does not perform itself.

37.    Under the contract, when LabCorp refers tests to a third-party provider, it must pay the third-party provider directly and request reimbursement from military treatment facilities only for the actual cost LabCorp paid to that provider, plus a small fixed fee.

38.    On information and belief, TRICARE ultimately pays some of the costs for these reference-testing services.

39.    On information and belief, the remainder of these costs are covered by other parts of DOD's budget.

### B.    LabCorp referred the Trio/XomeDX Test to a third-party provider, GeneDx.

40.    One of LabCorp's third-party providers is GeneDx, a genetic testing company that specializes in tests for rare and ultra-rare genetic disorders.

41.    Among other offerings, GeneDx performs the XomeDX, XomeDxPlus, and XomeDX Trio (collective, "Trio/XomeDX testing").  These tests use exome (part of the human

genome) sequencing to screen for genetic disorders, including genetic disorders in children and fetuses.

42. Although physicians perform these tests on DNA from a child or fetus suspected to have a genetic disorder, the tests are more accurate when samples from one or both biological parents are also analyzed and compared against the child's results.

43. Thus, even though a provider may request only one report—for the child or fetus—they also pull samples from one or both parents, and GeneDx analyzes both or all three exomes.

44. However, GeneDx only bills for the single report generated for the child or fetus.

45. The test costs between approximately $5,000 and $10,000.

**C. Relator discovered overpayments related to the Trio/XomeDX Test and attempted to correct those overpayments.**

46. Lt. Sascha Jung is the former Chief of Patient & Provider Services of the Department of Pathology at Walter Reed.  He was replaced by Cpt. Julian Alexander in mid-2017.

47. Walter Reed's Department of Pathology refers testing to LabCorp under the contract described above.

48. On or about July 17, 2017, as part of their transition of responsibilities, Lt. Jung and Cpt. Alexander reviewed LabCorp's billing records with respect to Trio/XomeDX testing with Sureia Ahmed, LabCorp's Hospital Key Account Executive responsible for Walter Reed. The review took place in person at Walter Reed.

49. Lt. Jung and Cpt. Alexander raised concerns that LabCorp had been double or triple billing for that testing.  Specifically, Lt. Jung asked whether LabCorp was inappropriately charging separately for tests on parental samples when those tests were included in the charge for the child's or fetus's test.

50.     Lt. Jung noted that he had raised this issue with Ms. Ahmed's predecessor, Jill Elliott, and had never received an adequate response from LabCorp.

51.     Ms. Ahmed told Lt. Jung and Cpt. Alexander that she would review their concerns with her manager, Betsy Lewis, an Associate Vice President of Business Development and Regional Manager of Business Development at LabCorp.

52.     Ms. Ahmed stepped out of her meeting with Lt. Jung and Cpt. Alexander and called Ms. Lewis to discuss the overbilling issue.

53.     Without performing an investigation of the issue, Ms. Lewis told Ms. Ahmed that LabCorp was billing correctly.

54.     Ms. Ahmed returned to the meeting and told Lt. Jung and Cpt. Alexander that LabCorp was properly billing Walter Reed for the Trio/XomeDX tests.

55.     On July 18, 2017, Lt. Jung approached Relator while she was on site at Walter Reed for one of her regular visits.  Lt. Jung told Relator it was urgent that they speak.  Before Relator left Walter Reed that day, she met with Lt. Jung and Cpt. Alexander to discuss LabCorp's billing practices for Trio/XomeDX testing.

56.     Lt. Jung and Cpt. Alexander told Relator that they believed LabCorp was inappropriately billing for GeneDx tests on parental samples that should have been included in the charge for the tests on the child or fetus.

57.     Lt. Jung also told Relator that he had brought this issue up with both Ms. Ahmed and Ms. Elliott before her, and neither had adequately addressed Lt. Jung's concerns.

58.     Lt. Jung stated that other military treatment facilities in the National Capital Region, including Fort Belvoir Community Hospital and Malcom Grow Medical Clinic, had expressed similar concerns.

59.     Relator requested that either Lt. Jung or Cpt. Alexander email her so she could escalate their concerns to her superiors within LabCorp.  Relator realized the potential

significance of the issue and wanted to have documentation to support her request for an investigation.

60.     Later that morning, Cpt. Alexander emailed Relator, memorializing her concerns. She also identified nine specimen numbers that she thought LabCorp had inappropriately billed.

61.     Shortly thereafter, Relator called Ms. Ahmed to discuss Cpt. Alexander and Lt. Jung's concerns regarding possible overbilling.

62.     Ms. Ahmed confirmed that she had spoken with Lt. Jung and Cpt. Alexander the previous day.  She also confirmed that Ms. Lewis said LabCorp was properly billing Walter Reed for the tests, and that Ms. Lewis had instructed Ms. Ahmed to relay that information to Lt. Jung and Cpt. Alexander.

63.     Relator then contacted Ms. Lewis by phone regarding LabCorp's billing for the Trio/XomeDX testing.  Ms. Lewis expressed surprise that Relator was investigating the overpayment concerns after Ms. Lewis had already spoken with Ms. Ahmed about the issue. Ms. Lewis reiterated that LabCorp was properly billing for the testing—again without having conducted any investigation.

64.     Relator responded that LabCorp at least had to look into the matter further for the patients that Lt. Jung and Cpt. Alexander had specifically identified.

65.     After her call with Ms. Lewis, Relator continued her investigation.  To confirm that LabCorp was properly billing for the expensive Trio/XomeDX testing, she reached out to LabCorp's Hospital Services department.  The manager of Hospital Services responsible for Walter Reed told Relator that the issue was beyond their investigative capabilities, and the inquiry should be directed to Valerie Howard, Director CET Hospital Services & Referrals at LabCorp's central office in Burlington, NC.

66.     On July 19, 2017, Relator emailed Ms. Howard as instructed by Hospital Services.  Relator forwarded the email she had received from Cpt. Alexander to Ms. Howard and

summarized Cpt. Alexander's concerns, which related both to the billing issues and to separate concerns regarding LabCorp's mishandling of lab test requests and samples.

67.     With respect to the billing, Relator specifically noted that Cpt. Alexander believed that even though parent and child or fetus samples were tested, GeneDx only charged LabCorp for a single report.  Relator asked Ms. Howard to confirm whether that understanding was correct.

68.     Later that evening, Ms. Howard replied that she had "not heard that GeneDx bills in the way you describe nor does any of the literature I reviewed on their website indicate that they bill in that manner."  Ms. Howard included Donna Hauser, the manager for Referral Testing at LabCorp, on the email and asked Ms. Hauser to investigate the issue.

69.     Relator replied late that evening, stating that she also believed the independent charges for the parental and child or fetus tests were appropriate.  She explained that she wanted to confirm her understanding because she was "not comfortable with the response provided," referring to the information she had received from Ms. Lewis and Ms. Howard, and saying she needed a "complete" response before reporting back to Walter Reed.

70.     Ms. Lewis, who was copied on Relator's emails, chastised her for contacting Ms. Howard directly about the issue.

71.     On July 20, 2017, Relator spoke with Cpt. Alexander by phone.  Cpt. Alexander again raised concerns with a heightened level of urgency regarding GeneDx testing and requested an audit of LabCorp's June 2017 GeneDx billing.

72.     Later that day, Relator sent a follow-up email to Ms. Hauser, copying Ms. Lewis and several other LabCorp employees, conveying a list of questions that Cpt. Alexander had asked about the GeneDx billing.  She also reiterated Cpt. Alexander's request for an audit.

73.     Cpt. Alexander called Relator that evening to ask whether Relator had concluded her research on the billing issue.  Relator told Cpt. Alexander that she had escalated the issue to

LabCorp's corporate headquarters and she would inform Cpt. Alexander as soon as she knew the answer.

74.     Relator then followed up with Ms. Lewis by phone to let her know that Cpt. Alexander had contacted her after working hours and was aggressively trying to resolve the potential overbilling and clinical issues. Relator stressed that LabCorp needed to address the issue promptly.

75.     Ms. Lewis stated that she would follow up with LabCorp's corporate headquarters and get back to Relator.

76.     Cpt. Alexander contacted Relator by phone several times between July 20, 2017 and July 24, 2017, requesting answers about the suspected overbilling. Relator repeatedly told Cpt. Alexander she was researching the issues and working to escalate them within LabCorp.

77.     On July 24, 2017, Relator sent another email to Ms. Hauser, with Ms. Howard, Ms. Lewis, and Ms. Ahmed included, requesting an update on Ms. Hauser's investigation of the billing issue.

78.     No one replied to that email.

79.     Separately, Ms. Hauser continued to investigate. That same day, Ms. Hauser sent an email to LabCorp's Burlington, North Carolina referrals department, forwarding Cpt. Alexander's concerns as relayed by Relator.

80.     The following morning of July 25, 2017, Nikki Capps at LabCorp sent an email to Michelle Carangi, Senior Lead, GeneDx Customer Service Representative, forwarding the email from Ms. Hauser containing Cpt. Alexander's concerns. Ms. Capps asked for clarification from Ms. Carangi as to whether GeneDx charged for analysis of parental and child samples, or whether it only charged for the single report.

81.     Ms. Carangi replied that day confirming, "[Y]ou're only billed once."

82.     Throughout the day Ms. Hauser continued her investigation and received multiple

confirmations that GeneDx only billed for the test report, and not the individual samples.

83.     Ms. Hauser relayed this information to Ms. Lewis by forwarding the email chain with Ms. Capps and Ms. Carangi.  Ms. Lewis subsequently noted in an email to Ms. Hauser, Ms. Ahmed, Relator, Ms. Howard, and several other LabCorp employees that "If Gene DX is only billing us one time for this test that[sic] someone will need to go back and credit all of the additional charges as well as fix how we bill for these going forward.  Gene DX should not be reaching out to the client as everything goes through LabCorp."

84.     Shortly thereafter, Ms. Howard requested additional time to complete her own investigation, and in particular to confirm with GeneDx how it billed LabCorp for the tests.  Ms. Howard noted that "We have to have a clear picture of what we are dealing with before we can respond [to Cpt. Alexander's concerns]."

85.     Ms. Lewis replied that Walter Reed "is obviously concerned given the high cost of these particular tests."

86.     Ms. Lewis followed up by email the following afternoon of July 26, 2017 to inquire whether Ms. Howard had contacted GeneDx.

87.     Ms. Hauser replied by email that "From what I have discovered there has been an error on our end.  Referrals has been entering charges for each specimen #'[sic] when Gene DX is only charging for one."  Ms. Hauser continued, "We are pulling a report dated through last June to see what can be determined."

88.     Ms. Lewis replied by email minutes later asking, "How far back are we going on the invoices? I am not sure when they started ordering this test, but we need to make sure that we make this right.  Also, I am assuming this could be a sizeable credit so I will need to notify Jim [Maruca, Vice President of Business Development] when we have a rough idea of what we are looking at."

89.     Ms. Howard replied, "[W]e are pulling a data mart but need to pull another

tomorrow."

90.     A data mart gives complete details on billing for a given test at LabCorp for a certain period of time.

91.     Based on Relator's understanding of LabCorp's data retention policy, Relator believes that LabCorp regularly archives its billing data, limiting access to older bills for data mart pulls such as the one Ms. Howard performed.

92.     Later on the evening of July 26, 2017, Relator wrote to Ms. Lewis and Ms. Ahmed that "Upon getting the 'total' credit due to Walter Reed, can we please hold tight. As this is s[sic] delicate arena within the facility and the DOD arena." She urged that "careful handling [was] required." Relator's intent was to ensure that LabCorp determined the scope of the error and reimbursed the government for the full amount of the overbilling.

93.     Ms. Lewis replied the following morning, July 27, 2017, that she agreed.

94.     Later that morning Ms. Howard sent another email stating, "I have a data pull from June of last year but this is not the only test I am seeing & Referrals is contacting GeneDX to provide a comprehensive list of tests that are billed in this manner so I can ensure I have all the info." Ms. Howard added that LabCorp's "referrals staff said they were told that each [tested family] member gets charged however they have no documentation of who that was nor when."

95.     Several days later, on August 2, 2017, Ms. Howard sent another email, writing, "Attached is the data pulled for Walter Reed Gene DX Trio/XomeDX testing. In white is what needs to be reimbursed to the client. They have been verified to be a part of family tests where all members (each had a specimen #) were charged for the test when only one family member should have." Ms. Howard again stressed that the referrals department did not know it was inappropriately billing when it charged for multiple samples.

96.     Ms. Howard included an attachment showing specific tests that LabCorp had inappropriately billed to Walter Reed. The inappropriately billed tests that report identified are

reproduced below:

| Specimen Number | Date of Service | Amount Charged | Clinical Info | Control Number |
|---|---|---|---|---|
| 608927187330 | 3/29/2016 | 5,025.00 | NLT485 D/S GENE DX TEST XOMEDX (Mom) FX:809443456349 | B0038866026 |
| 609627186810 | 4/5/2016 | 9,025.00 | NLT533 SENT TO GENE DX TESTS..XOMEDX TC#561 BLOOD | B0039217190 |
| 611127186040 | 4/20/2016 | 9,025.00 | NLT 648 DS:GENEDX XOME DX1FX#810287178950 | B0040084251 |
| 615327186210 | 6/1/2016 | 5,025.00 | NLT 986 DS:GENEDX XOMEDX 1FX#810285636093 | B0042296540 |
| 616027186440 | 6/8/2016 | 5,025.00 | NLT 1041 DS:GENEDX XOMEDX FX#810285636244 | B0042685216 |
| 618127186150 | 6/29/2016 | 5,025.00 | NLT 1164 DS:GENEDX XOMEDX FX#808888525077 | B0043778307 |
| 619027186060 | 7/8/2016 | 5,025.00 | NLT 1225 DS GENE DX FEDEX 8102 8563 7181 | B0044215409 |
| 619327185010 | 7/8/2016 | 5,025.00 | NLT 1227 DS GENE DX FEDEX 8102 8563 7332 | B0044270199 |
| 623027185870 | 8/17/2016 | 5,025.00 | NLT 1491 DS:GENEDX XOMEDX FX#810287178548 | B0046213218 |
| 623127186670 | 8/18/2016 | 5,025.00 | NLT 1498 DS GENE DX FEDEX 8102 8717 8364 | B0046299446 |
| 623127186710 | 8/18/2016 | 5,025.00 | NLT 1499 DS GENE DX FEDEX 8102 8717 8364 | B0046302362 |
| 623727186180 | 8/23/2016 | 5,025.00 | NLT 1536 DS:GENEDX XOMEDX FX#810287178467 | B0046568361 |
| 623727186190 | 8/23/2016 | 5,025.00 | NLT 1537 DS:GENEDX XOMEXPLUS FX#810287178467 | B0046568687 |
| 627927186440 | 10/4/2016 | 5,025.00 | NLT 1766 DS:GENEDX XOMEDX FX#810314435301 | B0048714415 |
| 627927186450 | 10/4/2016 | 5,025.00 | NLT 1765 DS:GENEDX XOMEDX FX#810314435301 | B0048715053 |
| 630027187250 | 10/26/2016 | 5,025.00 | NLT 1899 DS:GENEDX XOMEDX FX#810395992842 | B0049788944 |
| 631327187570 | 11/8/2016 | 5,025.00 | NLT 1978 DS:GENEDX XOMEDX FX#810395993297 | B0050446484 |
| 631327187580 | 11/8/2016 | 5,025.00 | NLT 1977 DS:GENEDX XOMEDX FX#810395993297 | B0050447153 |
| 631427187210 | 11/9/2016 | 5,025.00 | NLT 1989 DS:GENEDX XOMEDX TRIO FX#81039559334 | B0050507341 |

| | | | | |
|---|---|---|---|---|
| 631427187220 | 11/9/2016 | 5,025.00 | NLT 1990 DS:GENEDX XOMEDX FX#810395593334 | B0050508022 |
| 634327186021 | 12/7/2016 | 5,025.50 | TEST 561A - GENE DX FEDEX 8109 7661 9202 | B0051862745 |
| 702327187040 | 1/19/2017 | 5,025.50 | NLT 235 DS:GENEDX WHOLE GENOME SEQ FX#81174332328 | B0053897582 |
| 702627189220 | 1/26/2017 | 5,025.50 | NLT 296 DS:GENEDX WHOLE GENOME EXOME FX#811174332486 | B0054125339 |
| 702727186170 | 1/26/2017 | 5,025.50 | NLT 302 DS:GENEDX XOMEDX TRIO FX#811174332497 | B0054152232 |
| 702727186180 | 1/26/2017 | 5,025.50 | NLT 300 DS:GENEDX WHOLE EXOME SEQ FX#811174332497 | B0054152488 |
| 703227186260 | 1/31/2017 | 5,025.50 | NLT 389 DS:GENEDX WHOLE EXOME SEQ FX#811174332615 | B0054366086 |
| 703227188130 | 2/1/2017 | 5,025.50 | NLT 405 DS:GENEDX WHOLE EXOME SEQ FX#811174332615 | B0054411580 |
| 705827186780 | 2/27/2017 | 5,025.50 | NLT 759 DS:GENEDX WHOLE EXOME SEQ FX#810314436433 | B0055658446 |
| 705827186790 | 2/27/2017 | 5,025.50 | NLT 757 DS:GENEDX XOMEDX TRIO FX#810314436433 | B0055658968 |
| 706727186680 | 3/7/2017 | 9,025.50 | NLT 852 SEND TO GENE DX FORFEDEX #811302064273 | B0056144341 |
| 706727186700 | 3/7/2017 | 5,025.50 | NLT 846 DS:GENEDX XOMEDX FX#811302064273 | B0056146140 |
| 707627187140 | 3/16/2017 | 5,025.50 | 921 DS:GENEDX XOMEDX FX#811302064608 | B0056634294 |
| 710027187580 | 4/10/2017 | 5,025.50 | NLT 1082 DS:GENEDX FX#8113020265199 | B0057749169 |
| 710027187590 | 4/10/2017 | 5,025.50 | NLT 1081 DS:GENEDX FX#811302065199 | B0057749669 |
| 710927186810 | 4/18/2017 | 9,025.50 | NLT 1140 DS:GENEDX XOMEDX FX#811174333379 | B0058190486 |
| 710927186820 | 4/18/2017 | 9,025.50 | NLT 1142 DS:GENEDX WHOLE EXOME FX#811174333379 | B0058191466 |
| 714527187460 | 5/25/2017 | 5,025.50 | NLT 1366 DS:GENEDX FX#811586912897 | B0059988334 |
| 714527187470 | 5/25/2017 | 5,025.50 | NLT 1368 DS:GENEDX WHOLE EXOME FX#811586912897 | B0059988344 |

97.     The attachment showed $210,959 in overcharges on 38 inappropriately billed tests, including $113,525.50 for 21 tests billed between March 2016 and January 2017.

98.     Based on her understanding of LabCorp's data retention policies, Relator believes that Ms. Howard was only able to easily pull data for Walter Reed dating back to March 2016, though billing data dating back to the inception of the contract existed.  That additional data, however, would have required additional authorizations to review, which Ms. Howard did not seek.

99.     Later on August 2, 2017, Ms. Lewis emailed Ms. Ahmed and Relator, urging them "Please do not do anything with this data until we have a chance to discuss. I will look at the calendar for some time tomorrow when we can get on a call together to discuss strategy. How we handle this is very important."

100.    Relator sent an email to Ms. Lewis late that night, noting her travel schedule the following day, which limited her availability for a phone call.

101.    Ms. Lewis and Relator could not find a mutually agreeable time on the morning of August 3, 2017, to discuss the overbilling issues.

102.    Ms. Lewis emailed Relator attempting to schedule a call for 11 am, but Relator indicated she had a meeting at that time and would be traveling in the interim.

103.    During the time that Relator had told Ms. Lewis she would be traveling, Ms. Lewis sent a text message to Ms. Ahmed and Relator requesting a call.

104.    Relator did not see the message because she was traveling, and LabCorp has strict policies against reviewing text messages while driving.  Moreover, Ms. Lewis did not normally communicate through text message.

105.    While Relator was traveling, and without confirming her availability, Ms. Lewis created a calendar invite for a phone call with herself, Relator, and Ms. Ahmed for 11:00 a.m. that morning.

106.    Because Relator was traveling and did not receive the calendar alert, she did not attend the call.

107.    When Relator arrived at her destination, she saw the text message and called Ms. Lewis.  Ms. Lewis scolded Relator for not including her travel time and meetings for the day on her LabCorp calendar.

108.    No one at LabCorp had ever raised this as a concern with Relator before.

109.    Sometime between August 4 and August 7, 2017, Ms. Lewis called Ms. Ahmed and Relator to review the billing data and discuss how to proceed.

110.    Ms. Lewis asked whether Relator had reviewed the data.

111.    Relator stated that she had.

112.    Ms. Lewis asked who from Walter Reed needed to review LabCorp's resolution of the overbilling research and the proposed solution.

113.    Relator told her that Lt. Jung and Cpt. Alexander would need to approve the resolution.

114.    Ms. Lewis questioned why Lt. Jung needed to be involved, given his imminent transfer.

115.    Relator perceived that Ms. Lewis wanted as few people as possible to attend the meeting that would explain to Walter Reed how LabCorp intended to address the overbilling.

116.    Relator informed Ms. Lewis that Lt. Jung was still on site and had worked closely with LabCorp during his posting as Walter Reed's laboratory director.  Relator also reminded Ms. Lewis that Lt. Jung had been the first to request that LabCorp review the overbilling of Trio/XomeDX testing.

117.    Ms. Lewis asked Relator to set up a meeting with Lt. Jung and Cpt. Alexander.

118.    Ms. Lewis then asked Relator if she believed that Lt. Jung and Cpt. Alexander, on behalf of Walter Reed, would accept a credit for all inappropriately billed tests dating back only to January 1, 2017.

119.    Relator replied that the overbilling likely affected every DOD military treatment

facility laboratory that ordered the test, dating back to at least September 2013.

120.    Relator believed this because LabCorp had a worldwide contract to provide laboratory-testing services for DOD.  At the time, she believed that contract dated back to September 2013.

121.    Relator therefore asked Ms. Lewis why Walter Reed would accept a credit dating back only to January 1, 2017, when the overbilling likely dated back to the inception of the contract—and when LabCorp had already confirmed overbilling dating back to March 2016.

122.    Instead of agreeing to provide Walter Reed with a refund dating back to the inception of the contract and properly returning all identified overcharges, Ms. Lewis told Relator that she would offer to credit overcharges only back to January 1, 2017, unless Lt. Jung or Cpt. Alexander demanded that LabCorp provide credits for earlier charges.

123.    Ms. Lewis stressed that she was concerned about how to explain even the smaller credit for overbilling dating back to January 1, 2017 to Mr. Maruca and LabCorp's executives, particularly Ben Miller, then an Executive Vice President and now the Chief Operating Officer for LabCorp.

124.    Ms. Lewis pressed Relator to explain why Lt. Jung or Cpt. Alexander would not accept a credit back to January 2017.

125.    Relator replied that LabCorp was required under the DOD contract to understand the terms and pricing of third-party providers like GeneDx and ensure appropriate billing to DOD clients.

126.    Relator stated that only providing a credit back to January 2017 would not be consistent with LabCorp's responsibilities under the contract.

127.    Relator recommended that she, Ms. Lewis, and Ms. Ahmed discuss the overbilling and credit issue with Mr. Maruca and Brad Collier, LabCorp's Vice President of Corporate and National DOD contracts, given the importance of the contract and Mr. Collier's

direct relationship with Col. Robert Nace, who handled the LabCorp contract at DOD.

128.   Ms. Lewis did not agree that Mr. Collier did not need to be informed of the situation.

129.   Ms. Lewis then asked whether there was anything else she needed to be aware of that might come up at a meeting with Lt. Jung and Cpt. Alexander.

130.   Relator described a number of other issues she had repeatedly raised with Ms. Lewis over the past several months—including in emails over the prior few weeks—that Ms. Lewis and Defendant had failed to address.  These included delayed lab test results, confusing or inaccurate lab test results, and lost specimens.  The Chief of Pathology, Dr. Eric Pryor, and the Medical Director, Dr. Jeannie Muir, at Walter Reed had complained to Relator about these issues, which potentially jeopardized patient safety by delaying accurate diagnoses and the provision of appropriate treatment.

131.   To Relator's surprise, Ms. Lewis told her that she was not to attend the meeting with Lt. Jung and Cpt. Alexander, and was to stay away from Walter Reed altogether.  Ms. Lewis further instructed Relator not to have any communication with anyone at Walter Reed or the Department of Defense, including Lt. Jung and Cpt. Alexander.

132.   Relator believed that Ms. Lewis's actions were intended to silence Relator, who had been adamant about LabCorp's need to adequately address the serious billing and testing issues she had been raising and to communicate openly and honestly with Walter Reed and the DOD.

**D.    LabCorp terminated Relator shortly after she raised objections to providing only a partial credit for tests that LabCorp knew it had overbilled to Walter Reed.**

133.   On August 8, 2017, Ms. Lewis instructed Relator to come to the LabCorp facility in Herndon, Virginia, for a 4:00 p.m. meeting with Mr. Maruca and Ms. Lewis.

134.    Ms. Lewis told Relator that she needed to be prepared to discuss the "high-level issues" they had been facing. She further told Relator that this would allow Mr. Maruca to understand the issues facing Relator's clients.

135.    Over the previous month, at Mr. Maruca's request, Relator had been assembling a summary of the issues her clients had been facing with supporting documentation—all of which she had previously provided Ms. Lewis and/or Mr. Maruca. Relator was encouraged that she, Ms. Lewis, and Mr. Maruca apparently were going to discuss the issues at last.

136.    When Relator arrived at the meeting, she met with Mr. Maruca and Tara Hess from LabCorp's human resources department. Ms. Lewis attended the meeting by phone.

137.    Ms. Lewis stated that Relator was being terminated for sending emails from her LabCorp email address to her personal email. Ms. Lewis warned that there would be no discussion on the matter and that the decision was final.

138.    Ms. Lewis did not reference any policy Relator had violated, nor did she explain why LabCorp had been monitoring Relator's email use.

139.    Relator had, in fact, forwarded emails to her personal account, and had done so since the beginning of her employment in 2007. This was common for LabCorp staff who worked remotely and was a widely known practice due to difficulties working through Defendant's remote system. Moreover, Defendant had paid for Relator's home server and internet service throughout the course of her employment and was fully aware that she used her personal home office desktop computer to do work.

140.    Until Relator pressed her concerns about overbilling and noncompliance with Defendant's contracts with the DOD, Defendant had never cited her email practices as impermissible.

141.    Relator was instructed to surrender her cellphone, laptop, and the keys to her LabCorp vehicle, which she did.

142.    Mr. Maruca handed Relator a copy of her non-compete and instructed her to adhere to it.

143.    Relator asked whether Mr. Maruca would like to review the data she had been working on to ensure clients' needs were met going forward.  Mr. Maruca said that he did not have time to review the issues with her.

144.    Relator requested a written receipt for the hardware she returned stating it was in LabCorp's and Mr. Maruca's possession and in good condition.  She also requested a receipt documenting her vehicle's condition and mileage.  Mr. Maruca wrote the items down on a piece of legal-sized paper, signed and dated it, and handed it to Relator.

145.    Relator was sent home in a cab that was LabCorp had summoned and had waiting for her outside.

146.    Several weeks after her termination, Relator spoke with Cpt. Alexander to advise her that she was no longer working for Defendant.  Cpt. Alexander responded that she had wondered why Relator had not attended the meeting with Ms. Ahmed and Ms. Lewis to discuss the credit issues.

147.    Cpt. Alexander informed Relator that LabCorp had given Walter Reed a credit dating back to January 2017.

148.    Apparently recognizing that Relator had faced resistance from LabCorp management to her dogged efforts to investigate and address the billing and patient safety issues at Walter Reed, Cpt. Alexander added that she believed Relator's efforts to address the billing and other issues at Walter Reed had played a big part in Relator no longer being with LabCorp.

### E.    LabCorp covered up the extent of the overpayments by the federal government.

149.    Based on the allegations above, Relator believes, and therefore alleges, that LabCorp knew that it had overcharged Walter Reed for Trio/XomeDX testing since the inception

of LabCorp's worldwide DOD contract in June 2012.

150.    Based on Ms. Lewis's statements on the phone call that occurred between August 4 and August 7, 2017 and her call with Cpt. Alexander after her termination, both described above, Relator believes and therefore alleges that LabCorp only offered a credit to Walter Reed for overbilled Trio/XomeDX tests performed after January 1, 2017.

151.    However, on August 2, 2017, LabCorp had identified at least 21 improperly billed tests between March 29, 2016 and January 1, 2017.

152.    LabCorp had overcharged Walter Reed $113,525.50 for those tests.

153.    Based on Ms. Lewis's statements on the phone call that occurred between August 4 and August 7, 2017 described above, and on her conversation with Cpt. Alexander after Relator was terminated, Relator believes and therefore alleges that LabCorp only in fact provided a credit to Walter Reed for Trio/XomeDX tests performed after January 1, 2017.

154.    Relator knows that Ms. Howard only pulled records relating to Trio/XomeDX testing for the limited amount of time from March 2016 through June 2017.  Relator knows that the GeneDx Trio/Xome test has been offered since at least sometime in 2012 and that LabCorp began providing services to Walter Reed in or around June 2012.  Relator therefore believes and alleges that there are hundreds of additional instances of inappropriate billing of Trio/XomeDX tests to Walter Reed by LabCorp that cost hundreds of thousands or millions of dollars.

155.    Because LabCorp had a worldwide contract to provide reference testing services to DOD facilities, and because no one Relator spoke to at LabCorp knew, before late July 2017, that GeneDx only billed a single charge for Trio/XomeDX testing even when samples were taken from a parent or both parents, Relator believes and therefore alleges that the same overbilling that occurred at Walter Reed occurred at every military treatment facility under the same contract.

156.    Relator believes, based on her understanding of the DOD contract and the

prevalence of Trio/XomeDX testing, that LabCorp inappropriately billed DOD facilities across the world for thousands of tests worth millions of dollars under the contract referenced above. Other Government contracts may likewise be affected by the same error and LabCorp's conscious decision not to fully investigate the extent of its error and thus to remain willfully blind to additional overcharges.

157.    Relator believes, based on LabCorp's refusal to offer or provide a credit to Walter Reed for charges for Trio/XomeDX testing it knew had been inappropriately billed between March 2016 and January 1, 2017, that LabCorp has not investigated or offered any similar credits to any other facility under the DOD contract or elsewhere in its billing under Government contracts.

158.    Upon information and belief, TRICARE and/or DOD paid for these tests, with the Government ultimately bearing the financial cost of these tests that LabCorp should not have billed.

159.    Had the Government known at the time that LabCorp had inappropriately billed these tests, it would not have paid for them, because they were not permissible under LabCorp's contract with the DOD.

160.    Similarly, if the Government had later learned that LabCorp should not have billed for the tests, it would have demanded a refund or a credit—exactly as Lt. Jung and Cpt. Alexander did when they began to believe LabCorp had overcharged Walter Reed.

## VII.    CAUSES OF ACTION

### COUNT I
### False Claims Act
### 31 U.S.C. § 3729(a))(1)(G)

161.    Relator realleges and incorporates by reference the allegations contained in all paragraphs 1 – 160 above as if fully set forth herein.

162.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

163.    By virtue of the acts described above, Defendant knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

164.    Unaware that Defendant was knowingly concealing and/or knowingly seeking to avoid or decrease its obligation to repay the government, and unaware of any false statements or records that Defendant's agents made to help conceal the overpayment, the Government did not collect from Defendant the sums that it would have collected but for Defendant's unlawful conduct.

165.    By reason of Defendant's knowing acts and unlawful omissions, the United States has been damaged, and continues to be damaged, in a single damages amount to be determined at trial and trebled.

166.    Additionally, the United States is entitled to the maximum penalty for each violation alleged herein.

## COUNT II
## False Claims Act (Retaliation)
## 31 U.S.C. § 3730(h)

167.    Relator realleges and incorporates by reference the allegations contained in all paragraphs 1 – 160 above as if fully set forth herein.

168.    This is a claim by Relator for Defendant's unlawful termination of her employment, in violation of the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h).

169.    Defendant terminated Relator because of lawful acts that Relator undertook to report and stop what Relator reasonably believed were Defendant's violations of the False Claims Act, as well as lawful acts taken by Relator in furtherance of a possible action for violation of the False Claims Act.

170.    Relator's lawful acts, which 31 U.S.C. § 3730(h) protects from retaliation, include investigating, reporting, and objecting to Defendant's violations of the FCA.

171.    Defendant terminated Relator's employment on August 8, 2017, in retaliation for Relator's lawful acts described above in reporting, attempting to stop, and acting in furtherance of other efforts to stop what Relator reasonably believed were actions by Defendant in violation of the FCA, including Defendant's overbilling of the government for tests and the unlawful retention of moneys paid by the government for those tests over the course of Defendant's contract to provide services to Walter Reed.

172.    Defendant's termination of Relator violated 31 U.S.C. § 3730(h), which prohibits retaliation by employers against employees who investigate or report false statements within the meaning of 31 U.S.C. § 3729.

173.    As a direct and proximate result of the foregoing, Relator has lost the benefits and privileges of employment, and has suffered additional economic and non-economic damages, including severe emotional anguish and irreparable, continuing harm to her reputation and career. Relator is entitled to all relief necessary to make her whole.

## PRAYER

WHEREFORE, Relator Donna Hecker-Gross prays for judgment against Defendant as follows:

174.    That Defendant cease and desist from violating 31 U.S.C. §§ 3729, *et seq.*;

175.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus the maximum civil penalty allowable under 31 U.S.C. § 3729, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each violation;

176.    That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the Federal False Claims Act;

177.    That the Court enter judgment for Relator and against Defendant, pursuant to 31

U.S.C. § 3730(h), including an order reinstating Relator to her employment with the full

seniority and benefits she would have had, but for her retaliatory discharge, and awarding

Relator two times the amount of her back pay;

178.    That the Court award Relator compensatory and special damages in an amount to

be proven at trial for the emotional pain and suffering, humiliation, damage to career and loss of

enjoyment of life, to the extent permitted by law;

179.    That Relator be awarded all costs of this action, including attorneys' fees and

expenses; and

180.    That the United States and Relator recover such other and further relief as the

Court deems just and proper.

## VIII. **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Donna Hecker-Gross

hereby demands a trial by jury.

Dated: 11-8-18

Peter Chatfield (Bar Number 06270)
peter@phillipsandcohen.com
David Jochnowitz
djochnowitz@phillipsandcohen.com
PHILLIPS & COHEN LLP
2000 Massachusetts Avenue, NW
Washington, DC 20036
Tel: (202) 833-4567
Fax: (202) 833-1815
(*Pro Hac Vice* Motions to be Filed)

David J. Marshall
marshall@kmblegal.com
Michael A. Filoromo, III
filoromo@kmblegal.com

COMPLAINT

KATZ, MARSHALL & BANKS, LLP
1718 Connecticut Avenue, NW
Sixth Floor
Washington, DC 20009
Tel: (202) 299-1140
Fax: (202) 299-1148
(*Pro Hac Vice* Motions to be Filed)

Attorneys for Relator Donna Hecker-Gross

COMPLAINT